1   Joshua A. Bloom (SBN: 183358)
    MEYERS, NAVE, RIBACK, SILVER & WILSON
2   555 12th Street, Suite 1500
    Oakland, California 94607
3   Telephone: (510) 808-2000
    Facsimile: (510) 444-1108
4
    R. Morgan Gilhuly (SBN: 133659)
5   BARG COFFIN LEWIS & TRAPP, LLP
    350 California Street, 22nd Floor
6   San Francisco, California 94104-1435
    Telephone: (415) 228-5400
7   Facsimile: (415) 228-5450

8   Attorneys for Plaintiffs Coalition for a Sustainable
    Delta, Belridge Water Storage District, Berrenda
9   Mesa Water District, Cawelo Water District, North
    of the River Municipal Water District, Wheeler
10  Ridge-Maricopa Water Storage District, and Dee
    Dillon
11

**FILED**

**SEP 1 7 2015**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

12                    **UNITED STATES DISTRICT COURT**

13                    **EASTERN DISTRICT OF CALIFORNIA**

14

15  COALITION FOR A SUSTAINABLE              Case No. 2:09-cv-00466-JAM/KJN
    DELTA, a California nonprofit corporation, et
16  al.,                                     **[PROPOSED] ORDER REGARDING
                                             RETENTION OF JURISDICTION TO
17          Plaintiffs,                       ENFORCE TERMS OF THE
                                             SETTLEMENT AGREEMENT**
18          v.
                                             Judge:        Hon. John A. Mendez
19  CITY OF STOCKTON, a municipal            Action Filed: February 18, 2009
    corporation, and COUNTY OF SAN
20  JOAQUIN, a political subdivision of the State
    of California,
21
            Defendants.
22

23

24

25

26

27

28

1 **[PROPOSED] ORDER**

2       Plaintiffs Coalition for a Sustainable Delta, Belridge Water Storage District, Berrenda

3 Mesa Water District, Cawelo Water District, North of the River Municipal Water District,

4 Wheeler Ridge-Maricopa Water Storage District, and Dee Dillon, and Defendants City of

5 Stockton and County of San Joaquin, entered into a Settlement Agreement in the above-captioned

6 action. In accordance with the terms of the Settlement Agreement, the Parties seek the Court to

7 retain jurisdiction over the Settlement Agreement to enforce the Settlement Agreement's terms.

8 Concurrently with the filing of this [Proposed] Order, the parties have filed a Stipulation of

9 Dismissal with Prejudice.

10       GOOD CAUSE appearing, the Court hereby orders as follows:

11       1.       The terms of the Settlement Agreement attached hereto at Exhibit A are expressly

12 incorporated into this Order by reference.

13       2.       The Court retains jurisdiction over the Settlement Agreement to enforce the terms

14 of the Settlement Agreement.

15       **IT IS SO ORDERED.**

16

17 DATED: September 17, 2015

18                                         Hon. John A. Mendez

19                                         UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24

25

26

27

28

                                         2
[PROPOSED] ORDER RE RETENTION OF JURISDICTION TO ENFORCE SETTLEMENT

1

**EXHIBIT A**

2

**SETTLEMENT AGREEMENT**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is by and among Plaintiffs Coalition for a Sustainable Delta, *et al.* (all Plaintiffs referred to collectively herein as the "Coalition"), and Defendants City of Stockton and County of San Joaquin (collectively referred to herein as "Defendants", individually referred to as "City" and "County" respectively) (the Coalition and Defendants hereinafter collectively referred to as the "Parties"), in resolution of *Coalition for a Sustainable Delta, et al. v. City of Stockton, et al.*, Case No. 2:09-cv-00466-JAM-KJN (E.D. Cal.) (the "Litigation").

## RECITALS

**WHEREAS**, Plaintiff Coalition for a Sustainable Delta ("CSD") is a California nonprofit corporation comprised of agricultural and municipal and industrial water users and individuals in the San Joaquin Valley. The purpose of CSD is to advance the interests of its members, including to (1) better the conditions of those engaged in agricultural pursuits in the San Joaquin Valley, and (2) ensure a sustainable and reliable water supply by protecting the Delta and promoting a strategy to ensure its sustainability, thereby improving the grade of agricultural products and developing a higher degree of efficiency in agricultural operations;

**WHEREAS**, Plaintiff Belridge Water Storage District ("BWSD") is a California Water Storage District organized and existing under and by virtue of the provisions of Division 14 of the California Water Code. The BWSD encompasses approximately 93,000 acres of land in Kern County. The BWSD provides State Water Project ("SWP") water to land within its boundaries through a contract with the Kern County Water Agency ("KCWA"). The BWSD depends on SWP deliveries from the Delta to the San Joaquin Valley for its water supply;

1

**WHEREAS**, Plaintiff Berrenda Mesa Water District ("BMWD") is a California Water District organized and existing under and by virtue of the provisions of Division 13, Section 3400, of the California Water Code. The BMWD encompasses approximately 55,000 acres of land in Kern County. The BMWD provides SWP water to land within its boundaries through a contract with the KCWA. The BMWD depends on SWP deliveries from the Delta to the San Joaquin Valley for its water supply;

**WHEREAS**, Plaintiff Cawelo Water District ("CWD") is a California Water District organized and existing under and by virtue of the provisions of Division 13, Section 3400, of the California Water Code. The CWD encompasses at least 33,000 acres of land in Kern County. The CWD provides SWP water to land within its boundaries through a contract with the KCWA. The CWD depends on SWP deliveries from the Delta to the San Joaquin Valley for portions of its water supply;

**WHEREAS**, Plaintiff North of the River Municipal Water District ("NORMWD") is a California Municipal Water District organized and existing under and by virtue of the provisions of Division 20, Section 71000 of the California Water Code. The NORMWD encompasses approximately 12,800 acres of land in Kern County. The NORMWD provides SWP water to land within its boundaries through a contract with the KCWA. The NORMWD depends on SWP deliveries from the Delta to the San Joaquin Valley for its water supply;

**WHEREAS**, Plaintiff Wheeler Ridge-Maricopa Water Storage District ("WRMWSD") is a California Water Storage District organized and existing under and by virtue of Division 14 of the California Water Code. The WRMWSD encompasses approximately 147,000 acres of land in Kern County. The WRMWSD provides SWP water to agricultural land within its

2

boundaries through a contract with the KCWA. The WRMWSD depends on SWP deliveries from the Delta to the San Joaquin Valley for its water supply;

**WHEREAS**, Plaintiff Dee Dillon is an individual and is also a member of the Coalition;

**WHEREAS**, Defendant City of Stockton (City) is a California municipal corporation;

**WHEREAS**, Defendant County of San Joaquin (County) is a political subdivision of the State of California;

**WHEREAS**, stormwater discharges from areas within the Defendants' respective jurisdictions (together the "Stockton Urbanized Area" or "SUA") are regulated under *Waste Discharge Requirements – City of Stockton and County of San Joaquin Storm Water Discharges from Municipal Separate Storm Sewer System San Joaquin County,* Central Valley Regional Water Quality Control Board (Regional Water Board) Order No. R5-2007-0173, NPDES No. CAS083470 (the "2007 Permit"), and prior to that, *Waste Discharge Requirements – City of Stockton and County of San Joaquin Storm Water Discharges from Municipal Separate Storm Sewer System San Joaquin County,* Regional Water Board Order No. R5-2002-0181, NPDES No. CAS083470 (the "2002 Permit"). The 2007 Permit is referred to herein as the "MS4 Permit", and any prospective renewed MS4 permit is referred to as the "Renewed MS4 Permit";

**WHEREAS**, the Defendants are co-permittees under the MS4 Permit;

**WHEREAS**, a 60-Day Notice Letter alleging violations of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA") and Endangered Species Act ("ESA") was served on October 17, 2008, by certified mail, return receipt requested, to the City of Stockton, San Joaquin County, the California State Water Resources Control, the Regional Water Board Executive Officer, the California Department of Environmental Protection, U.S. Environmental

Protection Agency, the United States Attorney General, the United States Secretary of the Interior, and the United States Secretary of Commerce ("Notice Letter");

**WHEREAS**, the Coalition filed a Complaint in the Litigation on February 18, 2009;

**WHEREAS**, the Coalition and the Defendants, through their authorized representatives, and without adjudication of the Coalition's claims or admission by the Defendants of any alleged violation or other wrongdoing, choose to resolve fully the Coalition's allegations in the Notice Letter and Litigation through settlement and avoid the cost and uncertainties of further litigation;

**WHEREAS**, the Coalition and Defendants agree that it is in their mutual interest to enter into this Agreement setting forth the terms and conditions appropriate to resolve this matter without further litigation; and

**WHEREAS**, all actions taken by the Parties under this Agreement shall be taken in compliance with all applicable federal, state and local rules and regulations;

**NOW THEREFORE**, IT IS HEREBY AGREED AMONG THE SETTLING PARTIES AS FOLLOWS:

## EFFECTIVE DATE AND TERMINATION DATE

1. The term "Effective Date," as used in this Agreement, shall mean the day the District Court enters an order granting the stipulation to dismiss Plaintiffs' claims with prejudice as described in Paragraph 15 of this Agreement.

2. This Agreement will terminate on the later of December 1, 2018 or six (6) months after the Defendants' final monitoring event under the Enhanced Water Quality Monitoring and Investigation Program in Attachment A (the "Termination Date"); provided that, should the Dispute Resolution Process set forth in Paragraph 13 of this Agreement commence before the Termination Date, and judicial proceedings are commenced prior to the Termination Date and

4

continue after the Termination Date, this Agreement will remain effective for purposes of enforcement for that judicial proceeding only after the Termination Date.

## INJUNCTIVE MEASURES

3.     **MS4 Permit Compliance.** The measures in Paragraphs 4-12 below are intended to supplement, support or otherwise assist in Defendants' efforts to comply with the MS4 Permit or Renewed MS4 Permit, as applicable.

4.     **Enhanced Monitoring Program.**

(a)     The City and County shall implement the Enhanced Water Quality Monitoring and Investigation Program ("Enhanced Monitoring Program") set forth in Attachment A to this Agreement.

(b)     The City and County shall further implement a water quality monitoring program in accordance with the water quality monitoring program proposed in Defendants' June 6, 2012 Report of Waste Discharge and Proposed Stormwater Management Plan, Order No. R5-2007-0173, NPDES No. CAS083470 ("2012 ROWD") *(see 2012 ROWD, §2.7)*, at such time, if at all, the monitoring and reporting program of the 2007 MS4 Permit is amended or a Renewed MS4 Permit is issued, to incorporate the 2012 ROWD monitoring program. If, however, the Regional Control Board does not prior to the Termination Date amend the monitoring and reporting program of the 2007 MS4 Permit or issue a Renewed MS4 Permit to incorporate the 2012 ROWD monitoring program, the City and County shall continue implementing the 2007 MS4 Permit's monitoring and reporting program.

5

(c)     If a Renewed MS4 Permit incorporates a water quality monitoring program that is more comprehensive and broader than the program proposed in the 2012 ROWD and, at a minimum, additionally includes elements that are consistent with the Enhanced Monitoring Program, then the Defendants' requirements under Paragraph 4(b) shall be to comply with the monitoring requirements set forth in that Renewed MS4 Permit. If the Renewed MS4 Permit deviates from the 2012 ROWD and Enhanced Monitoring Program, the Parties will meet and confer to agree upon whether any monitoring in excess of the Renewed MS4 Permit's monitoring and reporting program is necessary to fulfill the Defendants' obligations under this Agreement.

5.     **Illicit Discharge Detection Program.** The County shall ensure 24-hour capability for routine response to illicit discharge reports (including investigation, cleanup, enforcement, and follow up outreach). Further, Defendants shall broaden training, to identify illicit discharges to the City and County's respective storm drain systems in the SUA and the appropriate methods for reporting, to all operational staff in the respective storm water programs (non-operational staff, such as clerical or supervisory staff, are exempt) and provide additional training, targeted to field personnel, to strengthen identification of illicit discharges and related water quality issues, including as part of routine maintenance. Defendants shall certify to the Coalition within 120 days of the Effective Date, that they have implemented, or will be implementing these measures, and thereafter shall include confirmation in their Annual Reports to be submitted in accordance with the 2007 MS4 Permit or Renewed MS4 Permit.

6.     **Outreach.** Beginning in 2017, the City shall permanently label all of the catch basins it inspects or cleans pursuant to Section 7(a) below that are not already labeled with a

6

"no dumping" message. The County shall, by no later than the Termination Date, have labeled no less than ninety-percent (90%) of its catch basins flowing directly to surface waters that are located within the County's respective portions of the SUA with a "no dumping" message.

7.   **Municipal Operations.**

(a)   Storm Drain Catch Basins. By December 31, 2016, the City shall develop and implement a database (GIS) designed to identify and track the inspection and cleaning of City-owned catch basins within its respective portions of the SUA that flow directly to surface waters. The City shall further augment its catch basin inspection program to include a form for use by City staff that documents the location, condition, and "no dumping" labeling of City-owned catch basins that flow directly to surface waters. The City shall utilize the information entered into the GIS database to prioritize the cleaning of City-owned catch basins that flow directly to surface waters. Beginning in 2017, the City shall inspect and clean no less than 1,000 City-owned catch basins that flow directly to surface waters per year for the remainder of the Settlement Agreement term. The City will continue its monthly inspections of the downtown Stockton area catch basins, and clean such catch basins on an as-needed basis. All other City-owned catch basins that do not flow directly to surface waters connect to pump stations containing wet wells that capture debris before it can reach surface waters, and are addressed under section 7(b) below. Nothing in subsection 7(a) is intended to replace or limit any requirements otherwise set forth in the applicable MS4 NPDES Permit.

(b)   Pump Station Cleanout. In addition to existing routine pump station cleaning based on inspections and best professional judgment, prior to the onset

7

of the wet season (no later than October 1st each year), Defendants shall annually inspect all pump stations within their respective storm drain systems located in the SUA, and clean out all pump stations to the extent debris or other materials take up 40% or more of the space in each such pump station. Furthermore, the City shall, within one hundred eighty (180) days of the Effective Date, develop and institute a standard operating procedure to avoid or minimize pollutant discharges to receiving waters during or as part of the pump station clean operations.

(c)     Pump Station Diversion/LID Treatment.   Any pump station constructed, or subject to a major retrofit,[1] after the Effective Date shall include, where technically and economically feasible, low flow diversion to a sanitary sewer for treatment of dry weather and some portion of first-flush flows.

(d)     Pollution Prevention Program.   The City shall, within ninety (90) days of the Effective Date, develop and implement a facility pollution prevention program (FPPP) for the City Corporation Yard. The FPPP shall document all applicable and necessary stormwater-related best management practices (BMPs) and source control measures (including inspection of all storm drain inlets and/or catch basins annually prior to the rainy season (prior to October 1st each year) and as needed cleaning and/or replacement of storm drain inlet and catch basin inserts, consistent with Section 7(a) above). The City shall further provide training for all appropriate Corporation Yard City staff be trained with regard to all such stormwater-related BMPs and source control measures.

---

[1] The term "major retrofit" refers to substantial modification, construction, or other capital improvements to an existing pump station. It is not intended to include routine improvements, replacement of parts, e.g., a new pump motor, and the like.

8

8. **Inspections.** Defendants shall, within one hundred twenty (120) days of the Effective Date, develop business outreach materials related to stormwater discharge and controls, with a particular emphasis on restaurants and food-service establishments. Distribution and presentation of such materials shall be incorporated as part of the Defendants' respective stormwater inspection programs.

9. **Pesticides.** The City shall incorporate integrated pest management requirements into new or renewed contracts with non-municipal pest control operators and landscapers, and shall make best efforts to coordinate with Eco-Wise Certified organizations in support of outreach. The County shall contract with or employ, or continue contracting with or employing, as the case may be, a pest-control advisor for all pesticide and herbicide use related to levee maintenance, parks and other non-structural pesticide and herbicide applications by County personnel.

10. **Pathogens.** Defendants shall prepare and distribute to the public a bilingual brochure concerning houseboat discharges (what to do/who to call if discharges are observed), and proper boating waste disposal at events where the boating community may be specifically targeted. Pathogens are further addressed as part of the Enhanced Monitoring Program described in Section 4(a) of this Agreement.

11. **Stormwater Quality Action Expenditures.** The City will increase the expenditures primarily ear-marked for Stormwater Quality Actions, defined below, by no less than Thirty-Five Thousand Dollars ($35,000.00) above the projected baseline in 2015 for such expenditures for each fiscal year for the term of this Agreement. The County will increase the expenditures primarily ear-marked for Stormwater Quality Actions by no less than Seven Thousand Dollars ($7,000.00) above the projected baseline in 2015 for such expenditures for

9

each fiscal year for the term of this Agreement. Stormwater Quality Action includes any action or measure implemented, or expenditure made, to improve water quality of discharges from the City or County's respective MS4 in the SUA, including reductions in pollutant loadings or concentrations in the MS4 discharge, or to otherwise comply with the MS4 Permit.

12. **Reporting.**

(a) Beginning in 2016, by October 31st of each year this Agreement is in effect, Defendants shall submit to the Coalition a report of the previous fiscal year, summarizing the results of any monitoring conducted in accordance with the Enhanced Monitoring Program, measures proposed in response to such Investigation Monitoring, and a summary of Stormwater Quality Action expenditures with sufficient specificity and information such that the Coalition can adequately review the status of Defendants' compliance with the Agreement.

(b) If, as a result of its review under Section 12(a), the Coalition does not agree with the Defendants' assessment or proposed actions, or does not have the information necessary for it to make a determination, or otherwise concludes that Defendants are not in compliance with the Agreement, it shall, within thirty (30) business days of receipt of Defendants' submission to the Coalition, notify Defendants. Representatives of the Defendants and Coalition shall meet and confer no less than thirty (30) business days after the Coalition provides such notice to Defendants. Any issue raised in the Coalition's notification under this Section 12(b) shall not be subject to dispute resolution under Section 13 until after the thirty (30) day meet and confer period set forth above in this Section 12(b).

## DISPUTE RESOLUTION

13. Any disputes arising under this Agreement shall be resolved in accordance with the following procedure. This procedure shall be initiated upon notice from one party to the

10

other of a dispute or alleged breach. The Parties shall, within fourteen (14) business days of such notice, meet and confer in an attempt to resolve the dispute. If the dispute cannot be resolved within fourteen (14) business days of the meet and confer, or other time period as to which the Parties mutually agree, the Parties shall jointly request a settlement meeting before a District Court magistrate judge or other court appointed or agreed upon private mediator. If such settlement meeting does not resolve the dispute, any Party may by motion submit the dispute to the Court to enforce the terms of the Agreement.

## JURISDICTION AND DISMISSAL

14. The Court shall retain jurisdiction over this matter through the Termination Date for the purposes of resolving disputes under or enforcing this Agreement. Furthermore, the Court shall retain jurisdiction after the Termination Date for purposes of enforcing this Agreement with regard to any dispute that arises prior to the Termination Date as described in Paragraph 2.

15. Within ten (10) business days of the last signature to this Agreement, the Parties shall submit a Stipulation of Dismissal with prejudice to the District Court consistent with Federal Rules of Civil Procedure, Rule 41(a)(1)(A)(ii). A copy of this Agreement shall be attached to the Stipulation.

## MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

16. In consideration of the terms set forth in this Agreement, and as of the Effective Date of this Agreement, the Coalition and their respective successors, assigns, directors, officers, agents, subsidiaries, attorneys, representatives, employees, and other representatives on the one hand, and the Defendants and their respective successors, assigns, directors, officers, agents, subsidiaries, attorneys, representatives, employees, and other representatives on the

11

other hand, each hereby release the other and their respective successors, assigns, officers, directors, agents, subsidiaries, affiliates employees, attorneys and other representatives, and all persons, firms, and corporations having an interest in them, from any and all claims and demands of any kind, nature, or description, and from any and all liabilities, relief, damages, fees (including fees of attorneys, experts, and others), injuries, actions, or causes of action, either at law or in equity, whether known or unknown, except as provided for in Section 13 of this Agreement, with respect to the Coalition's allegations and claims as set forth in the Notice Letter and the Litigation up to and including the Termination Date of this Agreement.

17.     The Parties acknowledge that they are familiar with California Civil Code Section 1542, which provides:

> A general release does not extend to claims which the creditor does not
> know or suspect to exist in his or her favor at the time of executing the
> release, which if known to him or her must have materially affected his or
> her settlement with the debtor.

Except as otherwise provided by this Agreement, the Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the Notice Letter and the Litigation up to and including the Termination Date of this Agreement.

18.     For the period beginning on the Effective Date and ending on the Termination Date, and except as provided for in Section 13 of this Agreement, the Coalition and its officers, executive staff, members of its governing board and any organization under the control of the Coalition, its officers, executive staff, or members of its governing board, covenant not to sue the Defendants with respect to the Coalition's allegations and claims as set forth in the Notice Letter and the Litigation or for any alleged violation of the Clean Water Act, the 2002 MS4

12

Permit, the 2007 MS4 Permit, the Renewed MS4 Permit, or any revisions thereto, or similar federal and state statutes and/or regulations. Further, for the period beginning on the Effective Date and ending on the Termination Date, the Coalition will not support other lawsuits, by providing financial assistance, personnel time, or other affirmative actions, against the Defendants that may be proposed by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge the Defendants' compliance with the Clean Water Act, the 2002 MS4 Permit, the 2007 MS4 Permit, the Renewed MS4 Permit or any revisions thereto, or similar federal and state statutes and/or regulations.

19.     The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation. Nothing in this Agreement shall be construed as, and Defendants do not intend to imply, any admission of fact, finding, conclusion, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligations, responsibilities, and duties of the Parties under this Agreement.

## ATTORNEYS' FEES AND LEGAL COSTS

20.     Each party to the Litigation shall bear its own costs, expenses and attorneys' fees incurred in, or otherwise arising out of or in any way related to, the matters released herein.

## MISCELLANEOUS

21.     This Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. Telecopy, pdf, and/or facsimile copies of original signatures will be deemed to be originally executed counterparts of this Agreement.

13

22.     In the event that any of the provisions of this Agreement are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

23.     The language in all part of this Agreement, unless otherwise stated, shall be construed according to it plain and ordinary meaning, except as to those terms specifically defined by the 2002 MS4 Permit, the 2007 MS4 Permit, the Renewed MS4 Permit, in which case those specific definitions apply.

24.     The Parties agree not to disparage the other party(ies), and the respective party's officers, directors, shareholders, employees, members and agents, in any manner likely to be harmful to them or their reputation relative to the allegations in, and defenses in response to, the Notice Letter and/or Litigation; provided that the Parties will respond accurately and fully to any question, inquiry or request for information when required by legal process.

25.     The undersigned are authorized to execute this Agreement on behalf of their respective Parties and have read, understood and agreed to all of the terms and conditions of this Agreement.

26.     Subject only to the express restrictions contained in this Agreement, all of the rights, duties and obligations contained in this Agreement will inure to the benefit of and be binding upon the Parties, and their successors and assigns.

27.     All agreements, covenants, representations and warranties, express or implied, oral or written, concerning the subject matter of this Agreement are contained herein.

28.     Any notices or documents required or provided for by this Agreement or related thereto that are required to be provided to the Coalition under this Agreement shall be sent by electronic mail, to the extent feasible, and, unless otherwise agreed to by the Parties, sent by U.S. mail, postage prepaid, and addressed as follows:

14

Melissa Poole
Paramount Farming Company
Regulatory Affairs Manager
33141 E. Lerdo Highway
Bakersfield, CA 93308-9767
Melissa.Poole@wonderful.com

With copies sent to:

Joshua A. Bloom
Meyers Nave
555 12th Street, Suite 1500
Oakland, CA 94607
jbloom@meyersnave.com

Any notices or documents required or provided for by this Agreement or related thereto that are

to be provided to Defendants under this Agreement shall be sent by electronic mail, to the extent

feasible, and, unless otherwise agreed to by the Parties, sent by U.S. mail, postage prepaid, and

addressed as follows:

City of Stockton:

Mel Lytle, Director
Municipal Utilities Department
City of Stockton
2500 Navy Drive
Stockton, CA 95206
mel.lytle@stocktongov.com

With copies sent to:

Kanwarjit S. Dua
Somach, Simmons & Dunn
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
kdua@somachlaw.com

San Joaquin County:

Brandon Nakagawa, P.E.
Water Resources Coordinator
San Joaquin County, Department of Public Works
1810 E. Hazelton Avenue
Stockton, CA 95205
bnakagawa@sjgov.org

With copies sent to:

Kristen M. Hegge
Chief Deputy County Counsel
County of San Joaquin
Courthouse, Room 711
222 E. Weber Avenue
Stockton, CA 95202-2777
khegge@sjgov.org

Nicole E. Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
ngranquist@downeybrand.com

29.     Signatures of the Parties transmitted by facsimile or email shall be deemed

binding.

30.     This Agreement shall be governed by the laws of the United States, and where

applicable, the State of California.

31.     This Agreement constitutes a full and final settlement of this matter. It is

expressly understood and agreed that this Agreement has been entered into freely and

voluntarily by the Parties and upon advice of counsel.

32.     The Parties have negotiated this Agreement, and agree that it shall not be

construed against the Party preparing it, but shall be construed as if the Parties jointly prepared

16

this Agreement, and any uncertainty and ambiguity shall not be interpreted against any one party.

33.     This Agreement, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the Parties.

34.     Except in case of an emergency but subject to the regulatory authority of any applicable governmental authority, any breach of or default under this Agreement capable of being cured will be deemed cured if, within five (5) business days of first receiving notice of the alleged breach or default, or within such other period approved in writing by the Party not making such allegation, which approval may not be unreasonably withheld, the Party allegedly in breach or default has actually cured or, if the breach or default can be cured but is not capable of being cured within such five (5) business day period, has commenced and is diligently pursuing to completion a cure.

35.     No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a Force Majeure event (act of god, fire, earthquake, flood, or restraint by court order or public authority) to the extent that such event is beyond the Party(ies) control, and only to the extent such delay in performance could not be reasonably avoided or mitigated. Without limitation, a Force Majeure event does not include reasonably expected inclement weather (e.g., precipitation less than or equal to a 100 year/24-hour storm event), economic hardship or ability to pay. Any Party that seeks to rely on this Paragraph shall have the burden of establishing that it could not have reasonably avoided or mitigated any consequences to its performance as a result of the Force Majeure.

17

36.    Nothing in this Agreement shall preclude Defendants from implementing actions

beyond the actions required herein to further reduce pollutants in, or improve the water quality

of, discharges from the Defendants' MS4.

Dated: _August 31, 2015_                    City of Stockton

By: Kurt O. Wilson
Title:  City Manager

Dated: _____              San Joaquin County

By: Katherine Miller
Title:  Chair of the Board of Supervisors

Dated: _____              Coalition for a Sustainable Delta, Belridge Water
                                           Storage District, Berrenda Mesa Water District,
                                           Cawelo Water District, North of the River
                                           Municipal Water District, Wheeler Ridge-Mariposa
                                           Water Storage District, Dee Dillon

                                           By: _____

APPROVED AS TO FORM AND CONTENT

By _____
        City Attorney

18

36.     Nothing in this Agreement shall preclude Defendants from implementing actions

beyond the actions required herein to further reduce pollutants in, or improve the water quality

of, discharges from the Defendants' MS4.

Dated: _____          City of Stockton

                                       By: _____

Dated: _August 18, 2015_               San Joaquin County

                                       By: _____

Dated: _____         Coalition for a Sustainable Delta, Belridge Water
                                       Storage District, Berrenda Mesa Water District,
                                       Cawelo Water District, North of the River
                                       Municipal Water District, Wheeler Ridge-Maricopa
                                       Water Storage District, Dee Dillon

                                       By: _____

18

Dated: _____          City of Stockton

                                          By: _____


Dated: _____          San Joaquin County

                                          By: _____


Dated: July 20, 2015                      Coalition for a Sustainable Delta, Belridge Water
                                          Storage District, Berrenda Mesa Water District,
                                          Cawelo Water District, North of the River
                                          Municipal Water District, Wheeler Ridge-Mariposa
                                          Water Storage District, Dee Dillon

                                          By: _____

18

**APPROVE AS TO FORM:**

Dated: 8/20/15

SOMACH SIMMONS & DUNN
A Professional Corporation

By: _____
    Kanwarjit S. Dua
    Attorneys for Defendant
    City of Stockton

DOWNEY BRAND

Dated: _____

By:
    Nicole E. Granquist
    Attorneys for Defendant
    County of San Joaquin

MEYERS NAVE

Dated:

By: _____
    Joshua A. Bloom
    Attorneys for Plaintiff
    Coalition for a Sustainable Delta

19

**APPROVE AS TO FORM:**

SOMACH SIMMONS & DUNN
A Professional Corporation

Dated: _____          By:_____

Kanwarjit S. Dua
Attorneys for Defendant
City of Stockton


DOWNEY BRAND

Dated: *Aug 20, 2015*          By:_____

Nicole E Granquist
Attorneys for Defendant
County of San Joaquin


MEYERS NAVE

Dated: _____          By:_____

Joshua A. Bloom
Attorneys for Plaintiff
Coalition for a Sustainable Delta

19

**APPROVE AS TO FORM:**

SOMACH SIMMONS & DUNN
A Professional Corporation

Dated: _____ _____          By:_____ _____ _____ __

Kanwarjit S. Dua
Attorneys for Defendant
City of Stockton

DOWNEY BRAND

Dated: _____          By:_____ ___ ___ ____

Nicole E. Granquist
Attorneys for Defendant
County of San Joaquin

Dated: $\frac{9}{10}/11$

MEYERS NAVE

By:_____

Joshua A. Bloom
Attorneys for Plaintiff
Coalition for a Sustainable Delta

19

## ATTACHMENT A

## Enhanced Water Quality Monitoring and Investigation Program

### 1. Wet Weather Monitoring

- Locations – three (3) waterbodies[2] will each be monitored for one (1) year[3] as follows:

    o Monitoring Sites - Monitor up to 3 additional outfalls (i.e. three outfalls in addition to the baseline outfall monitoring[4] occurring in the selected waterbody).

    o Frequency - Monitor three (3) storm events per waterbody.

    o Constituent Monitoring - Collect samples from each outfall for the 2012 ROWD pollutants of concern as identified in the corresponding ROWD tables (i.e., Table 2-42, Table 2-43, and Table 2-45).

### 2. Wet Weather Action Levels

For purposes of this Program, wet weather action levels are established for total suspended solids, biochemical oxygen demand, and fecal coliform as set forth in the table below.

| Parameter | Wet Weather Action Level |
|---|---|
| Total Suspended Solids (TSS) | 258 mg/L |
| Biochemical Oxygen Demand (BOD5) | 51 mg/L |
| Fecal Coliform | $1.1 \times 10^{5}$ MPN/100 ml |

### 3. Additional Parameters for Monitoring Purposes

  a. Dissolved Oxygen. When BOD samples are collected, dissolved oxygen shall be monitored concurrently. No action level shall be instituted for dissolved oxygen.

  b. Pyrethroids. Pyrethroids shall be monitored during each wet weather sampling event. No action level shall be instituted for pyrethroids.

### 4. Investigation

  a. Subject to 4.b and 4.c below, if an action level is exceeded, the Defendants will conduct an investigation within the upstream drainage-shed to identify potential pollutant sources. The investigation may include the following, as needed: visual inspection, up-gradient drainage system monitoring, land use assessment, mapping of construction sites and/or industrial facility locations, etc. If any site/business/land use is identified as a potential pollutant source(s) of the

---

[2] The waterbodies include Mosher Slough, Calaveras River, and Duck Creek.

[3] One waterbody will be monitored each year with all three waterbodies being monitored at the end of three years.

[4] Section 2.7.3 of the ROWD

20

constituent, then a more thorough site investigation will be conducted, with associated recommendations for pollutant source reduction. The investigation process includes, to the extent feasible, determining whether the discharge is occurring from private or public property.

b. It is anticipated that dissolved oxygen levels will decrease with increases in levels of $BOD_5$ absent consideration of other factors such as temperature, flow velocity, and turbulence. If dissolved oxygen levels below 5.0 mg/l do not directly correspond to increased $BOD_5$ levels, assessment of dissolved oxygen levels shall be specifically included in the investigation. Such investigation shall be conducted even if action levels are not otherwise exceeded.

c. At the end of the enhanced water quality monitoring and investigation program, the pyrethroid data collected will be compared to historic program data (where available) to determine if the concentrations are increasing, decreasing, or remaining the same and/or if there are any areas that require further investigation, which will be conducted in accordance with the applicable MS4 NPDES Permit. Defendants will report any pyrethroid data collected in Annual Reports in accordance with the applicable MS4 NPDES Permit.

5. **Actions in Response to Investigation.** In response to any investigation results and assessment, Defendants shall take such action(s) as may be reasonable, in consideration of both cost and technical feasibility, to improve the quality of stormwater discharges at issue. In considering the level of cost that may be reasonable, the value of Stormwater Quality Action expenditures specified under Paragraph 11 of the Settlement Agreement shall guide such consideration.

6. **Schedule** - The enhanced water quality monitoring and investigation program will be implemented during a three - year period, starting in the 2016 fiscal year.

21